FILED

2019 Jun-24  PM 02:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**MONICA ROBERTS,**

    **PLAINTIFF,**

**VS.**                           **CV NO.:**

**TOPRE AMERICA
CORPORATION,**

    **DEFENDANT.**              **JURY TRIAL DEMANDED**

## COMPLAINT

## I. JURISDICTION

1.     This action for injunctive relief and damages is brought pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202, and 42 U.S.C. § 12101 *et seq*. This is a suit authorized and instituted pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (ADA). The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights and Defendant's violation of the Act and for injunctive relief and damages.

2.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the last discriminatory act (Exhibit A). Plaintiff further filed this lawsuit within ninety (90) days after receipt of the right-to-sue letter issued by the EEOC (Exhibit B).

3.     This action for injunctive relief and damages is brought pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202, and 29 U.S.C. § 2617(a)(2). This is a suit authorized and instituted pursuant to the "Family and Medical Leave Act of 1993," 29 U.S.C. § 2601, *et. seq*. ("FMLA"). The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights and Defendant's violation of the Acts and for injunctive relief and damages.

4.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201 and 2202 and pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*.  District Court jurisdiction exists pursuant to 29 U.S.C. §§ 215(a)(3) and 217 and 28 U.S.C. § 1331.  The jurisdiction of this Court is invoked to secure the protection and redress the deprivation of rights secured by the FLSA.

## II. PARTIES

5.     Plaintiff, Monica Roberts, (hereinafter "Plaintiff") is a resident of Cullman, Cullman County, Alabama, and performed work for the Defendant in the counties composing the Northern District of Alabama during the events of this case. Thus, pursuant to 28 U.S.C. § 1391(b), venue for this action lies in the Northern District, Northeastern Division.

6.     Defendant, Topre America Corporation  (hereinafter "Defendant"), is a company registered and doing business in the State of Alabama and has sufficient minimum contacts with the State of Alabama that it is subject to service of process

in Alabama.  Defendant is an entity subject to suit under 28 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.*  Defendant employed at least fifteen (15) persons during the current or preceding calendar year.  Therefore, this Court has personal jurisdiction over Defendant.

7.      Defendant is an entity subject to suit under 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2). Defendant employed at least fifty (50) persons for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. Defendant employed these fifty (50) employees within 75 miles of Plaintiff's worksite.

8.      Defendant is a company doing business in the State of Alabama. Therefore, this Court has personal jurisdiction over Defendant.  Defendant is engaged in commerce from the production of goods as contemplated by 29 U.S.C. §§ 203(r), 203(s).

## III.  STATEMENT OF FACTS

9.      Plaintiff hereby incorporates by reference each of the allegations contained in paragraphs 1 through 8 above.

10.      Defendant hired Plaintiff on or about July 24, 2006.

11.      Defendant employed Plaintiff as a Fork Lift Operator.

12.      Defendant terminated Plaintiff's employment on March 29, 2018.

13.     At all times during the employment relationship, Defendant properly classified Plaintiff as an hourly paid, non-exempt employee.

14.     Plaintiff's last hourly rate of pay with Defendant was $18.52 per hour with an overtime rate of $27.78 per hour.

15.     During the three years preceding the filing of this Complaint, Defendant was, and is, an enterprise engaged in commerce or the production of goods in commerce as defined by 29 U.S.C. 203(s)(1).

16.     During the three years preceding the filing of this Complaint, Defendant has been a company whose employees, including the Plaintiff, are engaged in interstate commerce as defined by the Fair Labor Standards Act.

17.     Defendant's gross annual volume of revenue, on a rolling quarterly basis, exceeds $500,000.

18.     At all times relevant to this action, Defendant was an employer of Plaintiff as defined by 29 U.S.C. § 203(d).

19.     During the three years preceding the filing of this Complaint, Plaintiff, was an employee of Defendant as defined by 29 U.S.C. § 203(e)(1).

20.     Plaintiff and all similarly situated employees employed by Defendant were engaged in interstate commerce and/or the production of goods for interstate commerce while working for Defendant.

21. During the three years preceding the filing of this Complaint, Defendant recorded Plaintiff's hours worked in excess of forty hours for a work week on at least one or more occasion.

22. Plaintiff is a person with one or more disabilities including congestive heart failure, kidney failure, and other related ailments.

23. Plaintiff was able to perform the essential functions of her job with accommodation for her disability.

24. Plaintiff's reasonable accommodation was simply time off from work to attend doctor's appointments.

25. Defendant hired Plaintiff in or about June 24, 2006.

26. Defendant initially employed Plaintiff as an operator.

27. After about a year and a half into the employment relationship, Defendant promoted Plaintiff to the position of forklift operator.

28. Plaintiff performed her duties in a satisfactory or better manner for her entire career with Defendant.

29. Plaintiff disclosed her kidney disease to Defendant upon her hiring.

30. After one-year of employment Plaintiff became eligible for intermittent leave pursuant to the Family and Medical Leave Act.

31. Plaintiff commenced using intermittent FMLA leave upon the completion of her first year of employment.

32. Defendant employed Natalie Caudle.

33. Caudle worked as Defendant's Human Resources Manager.

34. Over the years, Plaintiff experienced significant pushback from Natalie Caudle regarding the use of her FMLA leave.

35. Each time Plaintiff submitted FMLA paperwork to continue FMLA leave needed to care for her disability, Caudle required Plaintiff to return to her doctor to make revisions.

36. In September 2017, Plaintiff was diagnosed with Congestive Heart Failure.

37. In January 2018, Topre implemented a 200% check process in which all employees who touched an item had to sign off to indicate that certain parts had been checked to ensure that the correct products were in the correctly labeled containers.

38. During the following weeks, Defendant's management changed the process at least seven times, causing confusion about which products needed to be signed off on and how the process worked.

39. Defendant emloyed Heath Harden,

40. Harden worked as Defendant's Assembly Manager.

41. Defendant emloyed Steven Wilhite.

42. Wilhite worked as a Supervisor.

43.     Defendant employed Anthony Naylor.

44.     Naylor worked as Plaintiff's supervisor.

45.     Defendant employed Keith Elliot.

46.     Elliot worked as Plaintiff's Team Lead.

47.     During the first week in January, Grant Crosby failed to sign off on a label, but Defendant's managers issued Crosby a written disciplinary warning.

48.     Plaintiff and Brenda Jeffers objected to Crosby's written disciplinary warning.

49.     Plaintiff, Jeffers, Jimmy Gillispie, Grant Crosby, Louis Armstrong, asked for a meeting with Stephen Wilhite, Anthony Naylor, Heath Harden, and Keith Elliot.

50.     During the meeting, the forklift drivers complained about the new procedures.

51.     Harden assured the forklift drivers that they would not lose their jobs over the procedural change.

52.     Plaintiff complained about the write-up, another fork lift operator also complained that the process was unclear and confusing during a meeting with Harden, Wilhite, Supervisor, and Naylor.

53.     During that meeting, the managers agreed that no operators would lose their job over the labeling issues.

54.     On or about March 15, 2018, Plaintiff attended a team meeting with all of her co-workers.

55.     During the meeting Plaintiff's team lead, Elliott announced that from then on employees who needed to talk to HR about their FMLA could only do so off-the-clock.

56.     The same day, Plaintiff went to Defendant's Human Resources Office and met with Caudle about her FMLA.

57.     Plaintiff was in the process of seeking FMLA leave for her congestive heart failure.

58.     During the meeting, Plaintiff asked whether it was true that employees could no longer discuss FMLA with HR unless they clocked out.

59.     Caudle asked Plaintiff whether she had clocked out.

60.     Plaintiff said she had clocked out and then asked her again whether Elliott's statement was true.

61.     Caudle said Elliot's statement was true.

62.     Caudle then told Plaintiff that she had so many FMLA claims that she could not keep up and showed her a stack of papers that were purportedly FMLA claims.

63.     Caudle further said that the clocking out procedure was only temporary until she caught up.

64.     Plaintiff said she was only concerned with her own FMLA leave.

65.     On or about March 15, 2018, Plaintiff told Elliott that she was going to be off the next day for a doctor's appointment related to her disability.

66.     Defendant employed Ashley Stanley.

67.     Stanley worked as a Supervisor.

68.     Stanley and Naylor called Plaintiff into the office and told her that if she was off the next day it would mean that she would be written up.

69.     Plaintiff protested the write up and asked the supervisors to retrieve her attendance log.

70.     Then Naylor reviewed those points with another supervisor, Ashley Stanley.

71.     Naylor allowed Plaintiff to retrieve the attendance log.

72.     Plaintiff, Naylor and Stanley began to go over the dates together. Then Naylor reviewed those points with another supervisor, Ashley Stanley.

73.     As Plaintiff, Naylor and Stanley reviewed Plaintiff's attendance points, the three found dates that Caudle had not properly entered as FMLA, and instead were being incorrectly counted as points under Defendant's attendance policy.

74.     Naylor told Plaintiff to clear the absences with Caudle.

75.     Plaintiff went to Caudle's office.

76.     Plaintiff relayed the incorrect counting of Plaintiff's attendance points to Caudle.

77.     Caudle told Plaintiff that she had not submitted the doctor's notes for the FMLA absences.

78.     Upon information and belief, the accommodation Plaintiff sought, FMLA leave, does not allow any employer to request notes for each absence.

79.     Eventually, Caudle found the notes that she had obtained and changed the records so that Plaintiff would not be disciplined under Defendant's attendance policy.

80.     On March 19, 2018, Caudle gave Plaintiff an FMLA Designation Notice requesting additional information from her physician.

81.     On March 21, 2018, Plaintiff's physician signed the updated FMLA Certification of Health Care Provider for Employee's Serous Health Condition that Caudle requested.

82.     Plaintiff delivered the updated and signed FMLA Certification of Health Care Provider for Employee's Serious Health Condition form to Defendant on or before March 26, 2018.

83.     On or about March 28, 2018, Naylor, Burt Rowan, and Jennifer Turner, Mary Glenn called Plaintiff into a meeting asking her to write out a statement concerning an incident regarding the labeling of some parts to ensure that the parts

Defendant transported were correctly labeled on two separate days in which the parts were allegedly incorrectly labeled.

84.     During the days in question, there were multiple forklift operators working in the area that could have mislabled the products.

85.     Moreover, the labels that were allegedly mislabeled went through another area to be shipped and the person who apparently shipped the items also failed to label the items properly.

86.     On March 29, 2018, Plaintiff worked her full shift.

87.     At the end of March 29, 2018 shift, Wilhite asked Plaintiff to go to the office to speak to Rowan.

88.     Plaintiff went to the office and met with Rowan and Mary Glenn.

89.     Rowan and Glenn terminated Plaintiff for the alleged mislabeling problem.

90.     Other people who do not have disabilities that required medical leave did not get terminated when they made the same mistake.

91.     In fact, Keith Elliot often tracked down other forklift operators so they could sign off on the labels.

92.     Gillespie and Armstrong incorrectly labeled the items and were not disciplined.

## IV.  COUNT ONE - Americans with Disabilities Act - Termination

93.    Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 92 above as if fully set forth herein.

94.    Plaintiff suffers from the physical and/or sensory impairment of kidney disease, congestive heart failure, and fibromyalgia.

95.    Plaintiff's kidney disease, congestive heart failure, and fibromyalgia affects her such that the major life activities of walking, standing, lifting, bending, breathing, concentrating, and working (to the extent necessary to attend doctor's appointments); as well as the functions of her respiratory, circulatory, ands endocrine systems in way that significantly restricts Plaintiff as compared to the average person in the general population.

96.    Plaintiff sought the reasonable accommodation of FMLA leave in order to attend her doctors' appointments to treat her disabilities.

97.    Plaintiff has suffered from kidney disease since at least 1999.

98.    Plaintiff has suffered from congestive heart failure since 2017.

99.    Defendant hired Plaintiff on or about July 24, 2006.

100.   Defendant employed Plaintiff as a Fork Lift Operator.

101.   The position of Fork Lift Operator required Plaintiff to operate a fork lift to move materials within Defendant's plant, verify part numbers on labels and

containers, and communicate with Team Leaders and Supervisors regarding product inventory and potential shortages.

102.   Plaintiff was qualified for the position of Fork Lift Operator with or without a reasonable accommodation of her disability.

103.   Defendant terminated Plaintiff's employment on March 29, 2018.

104.   Defendant terminated Plaintiff for allegedly mislabeling a package.

105.   Other people who do not have disabilities that required medical leave did not get terminated when they made the same mistake.

106.   In fact, Keith Elliot often tracked down other forklift operators so they could be sign off on the labels.

107.   Gillespie and Armstrong incorrectly labeled the items and were not disciplined.

108.   Upon information and belief, Gillespie and Armstrong are not disabled as defined by the Americans with Disabilities Act.

109.   But for Plaintiff's disability, Defendant would not have terminated Plaintiff's employment.

110.   In violation of the Americans with Disabilities Act, Defendant terminated Plaintiff's employment in whole or in part because of her disability.

111.   As a result of Defendant's discriminatory actions, Plaintiff has suffered loss of pay, benefits, and mental anguish.

## V.  COUNT TWO – FMLA DISCRIMINATION/RETALIATION

112.  Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 111 above as if fully set forth herein.

113.  During the 12-month period prior to March 19, 2018, Defendant employed Plaintiff for at least 1,250 hours of service.

114.  Defendant employs fifty (50) or more persons for each working day during each of the 20 or more calendar work weeks in the current or preceding calendar year of Plaintiff's March 19, 2018 re-certification of intermittent FMLA leave.

115.  During the week of March 29, 2018, Defendant employed fifty or more employees that worked within 75 miles of the location where Plaintiff worked.

116.  Throughout her employment, Plaintiff exercised her rights to use intermittent FMLA leave to care for her disabilities.

117.  Plaintiff provided notice of her foreseeable need of FMLA leave thirty days prior to the beginning of the FMLA leave and regularly recertified her FMLA leave on an annual (or shorter) basis.

118.  Defendant provided Plaintiff with a Notice of Eligibility and Rights and Responsibilities form in regard to her kidney disease.

119.  Defendant last provided Plaintiff with a Notice of Eligibility and Rights and Responsibilities form on or about February 21, 2018.

120.   Defendant last provided Plaintiff with an FMLA Designation Notice form on or about March 19, 2018 and such notice requested additional information.

121.   Defendant provided Plaintiff with an FMLA Certification of Health Care Provider for Employee's Serious Health Condition form on March 19, 2019.

122.   Plaintiff's physician signed the FMLA Certification of Health Care Provider for Employee's Serious Health Condition form on March 21, 2018.

123.   Plaintiff delivered the updated and signed FMLA Certification of Health Care Provider for Employee's Serious Health Condition form to Defendant on or before March 26, 2018.

124.   Defendant terminated Plaintiff's employment on March 29, 2018.

125.   Defendant's employees had knowledge that Plaintiff suffered from an FMLA qualifying condition for which she needed intermittent FMLA leave for treatment of her disabilities.

126.   On March 29, 2018, Defendant terminated Plaintiff's employment for the stated reason of mislabeling crates.

127.   Defendant terminated Plaintiff's employment on March 29, 2018.

128.   Defendant terminated Plaintiff for allegedly mislabeling a crate.

129.   Upon information and belief, Defendant did not terminate other employees that did not use FMLA leave but made the mistake of mislabeling packages and crates.

130. In fact, Keith Elliot often tracked down other forklift operators so they could sign off on the labels.

131. Gillespie and Armstrong incorrectly labeled the items but were not disciplined by Defendant.

132. Defendant's Caudle did not terminate Gillespie and Armstrong, for mislabeling crates.

133. Upon information and belief, Gillespie and Armstrong did not exercise intermittent FMLA rights during their employment.

134. But for Plaintiff's FMLA leave, Defendant would not have terminated Plaintiff's employment.

135. In violation of the Family and Medical Leave Act, Defendant terminated Plaintiff's employment in whole or in part because of her use of intermittent FMLA leave.

136. As a result of Defendant's discriminatory termination decision in violation of the FMLA, Plaintiff has been damaged, suffering loss of pay and benefits.

## VI. COUNT THREE – Fair Labor Standards Act – Unpaid Overtime

137. Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 136 above as if fully set forth herein.

138.   During the three years preceding the filing of this Complaint, Plaintiff worked forty or more hours for the benefit of Defendant during some or all of the work weeks.

139.   Defendant paid Plaintiff for some, but not all, of Plaintiff's overtime hours at one and one-half times her regular hourly rate of pay.

140.   Defendant has a policy where it automatically deducted thirty minutes of an employee's recorded work time for an unpaid meal break.

141.   Defendant's policy of deducting thirty minutes of an employee's recorded work time for an unpaid meal break did not take measure to ensure that the non-exempt employee is fully relieved of his or her job duties for the full thirty minutes.

142.   Defendant's customers are automobile manufacturers that rely on shipping of products in a specific and timely fashion.

143.   During the three years preceding the filing of this complaint, Plaintiff only received a partial meal break because of interruptions to care for shipping needs, such as changing containers for workers, moving completed roll packs for operators, providing empty roll packs for operators, or moving baskets, for some, or all, days worked during some, or all, of the work weeks.

144.   During Plaintiff's meal breaks, Defendant required Plaintiff to leave and attend to the shipping needs.

145.   During the three years preceding the filing of the original complaint, Defendant failed to pay Plaintiff her overtime rate of one and one-half times her regular hourly rate of pay for working through missed meal breaks in work weeks for which she otherwise worked forty hours or more, thus resulting in a violation of the FLSA.

146.   Plaintiff estimates she worked through her meal periods for the benefit of Defendant for approximately two (2) out of a possible five (5) meal periods during a five-day work week; however, sometimes Plaintiff worked through as many as all of her meal periods during a work week, that included as many as six (6) days during the work week.

147.   Plaintiff performed work for Defendant, on Defendant's premises, in plain sight, and at management's request during their uncompensated meal breaks.

148.   Defendant's management, including Kenneth Twitty, Justin Litz, Stephen Wilhite, Anthony Naylor, Ashley Stanley, and others, observed Plaintiff perform labor during her uncompensated meal breaks

149.   Defendant's management, including but not limited to Keith Elliott, Ceci Caples, and Kurtrese Johnson, directed Plaintiff to work during her uncompensated meal breaks.

150.   Defendant's expectation was that Plaintiff, and other employees, were expected to cut short their meal period to allow the Defendant to stay on schedule and meet the needs of its customers.

151.   Defendant failed to pay Plaintiff her overtime rate of one and one-half times her regular hourly rate of pay for working through missed meal breaks in work weeks for which she otherwise worked forty hours or more, thus resulting in a violation of the FLSA.

152.   Upon information and belief, Plaintiff worked in excess of forty hours in a work week for the pay periods ending June 26 or July 3, July 10 or 17, July 24 and 31, August 7, 14, 21, 28, September 4 or 11, September 18 or 25, October 2, 9, 16, 23, 30, November 6, 13, 20, November 27 or December 4, 11, 18, and 25, 2016.

153.   Upon information and belief, Plaintiff worked in excess of forty hours in a work week for the pay periods ending January 1, 8 or 15,  22 or 29, February 5, 12, 19, 26, March 5, 12, 19 or 26, April 2 or 9, 16 or 23, 30 or May 7, May 14, 21, May 28 or June 4, June 11 or 18, June 25 or July 2, July 9 or 16, July 23 and 30, August 6 or 13, August 20, and 27, September 3 or 10, September 17 and 24, October 1 or 8, October 15, 22, and 29, November 5, November 12 or 19, November 26 or December 3, December 10 and 17, December 24 or 31, 2017.

154.   Upon information and belief, Plaintiff worked in excess of forty hours in a work week for the pay periods ending January 7, 14, 21, 28, February 4, 11, 18, 25, March 4, 11, 18, 25, April 1 or 8, 2018.

155.   Plaintiff may have worked in excess of forty hours in other work weeks but Plaintiff requires production of Defendant's records kept in compliance with 29 U.S.C. § 211 and 29 C.F.R. § 516.2 to determine the exact work weeks she exceeded forty hours of recorded labor.

156.   As a result of Defendant's intentional and willful violation of the FLSA, Plaintiff has been damaged, suffering loss of overtime pay.

## VII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

A.     Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate the terms of the Americans with Disabilities Act;

B.     Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate the terms of the Family and Medical Leave Act;

C.      Enter an Order requiring the Defendant to make Plaintiff whole by awarding reinstatement to the position she would have had, had she not been terminated;

D.      In regard to Count One, award Plaintiff back pay, together with employment benefits, front pay, compensatory damages; punitive damages; special damages; nominal damages;

E.      In regard to Count Two, award Plaintiff back pay, together with employment benefits, front pay, liquidated damages; special damages; nominal damages;

F.      In regard to Count Three, award Plaintiff unpaid overtime compensation, liquidated damages equal to that amount of compensation; special damages; nominal damages;

G.      Attorneys' fees and costs;

H.      Plaintiff requests that the Court award Plaintiff equitable relief pursuant to 28 U.S.C. § 2201 and 29 U.S.C. § 2601 *et seq*. and 42 U.S.C § 12101 *et seq*. that the actions of Defendant violated the law; and,

I.      Any different or additional relief as may be determined by the Court to which Plaintiff is entitled.

_____

Allen D. Arnold

**OF COUNSEL:**

ALLEN D. ARNOLD, Attorney at Law
A Member of The Five Points Law Group, LLC
2151 Highland Avenue South, Ste. 205
Birmingham, AL 35205
T: (205) 252-1550
F: (205) 502-4476
allen@5pointslaw.com

**PLAINTIFF REQUESTS TRIAL BY STRUCK JURY**

OF COUNSEL

**DEFENDANT'S ADDRESS:**
Topre America Corporation
c/o CT Corporation
2 North Jackson Street, Ste. 605
Montgomery, AL 36104